431 So.2d 885 (1983)
STATE of Louisiana, Appellee,
v.
Ricardo Leon WILLIAMS, Appellant.
No. 15354-KA.
Court of Appeal of Louisiana, Second Circuit.
May 3, 1983.
Writ Denied June 27, 1983.
Jack Wright, Jr., Monroe, for appellant.
William J. Guste, Jr., Atty. Gen., Barbara B. Rutledge, Asst. Atty. Gen., Baton Rouge, Johnny Parkerson, Dist. Atty., Robert S. Kennedy, Jr., Asst. Dist. Atty., Monroe, for appellee.
Before PRICE, HALL, and MARVIN, JJ.
*886 HALL, Judge.
The defendant, Ricardo Leon Williams, was charged by bill of information with one count of forcible rape and one count of attempted forcible rape, in violation of LSA-R.S. 14:42.1.[1] The defendant was found guilty by a twelve-person jury and was sentenced to 15 years imprisonment at hard labor on the first count and 10 years imprisonment at hard labor on the second count, the sentences to run consecutively. The defendant appealed, assigning three errors.
The charges arose out of two incidents which occurred between two inmates of cell block D of the Ouachita Parish jail during the late night or early morning hours of a Friday and Sunday in August 1982. On the first occasion the defendant engaged in an act of anal sexual intercourse with one James "Indian" Townsend and on the second occasion the defendant attempted to engage in the same act with Townsend. The essence of the state's case was that Townsend submitted to the acts because of physical threats made to him by the defendant under circumstances where Townsend reasonably believed that resistance would not have prevented the rape. Through a recorded statement given to police officers and by testimony at the trial defendant admitted the acts but claimed they were consensual.
In assignment of error No. 1 the defendant contends that there were insufficient facts to persuade a rational trier of fact of guilt beyond a reasonable doubt. Defendant's argument is centered on the alleged lack of evidence of the essential elements of force or threats of physical violence and the existence of circumstances which justified the victim in reasonably believing that resistance would not prevent the rape. The defendant urges that the victim's testimony was not specific in regard to threats of physical violence, that there had not been any previous trouble between the defendant and the victim, that the victim should have tried to get help from other inmates in the cell, that because the cell was equipped with a television monitor and a panic button and guards were stationed nearby the victim could and should have sought assistance from the guards, and that any resistance or efforts on his part would have prevented the rape and any belief on his part to the contrary was not reasonable. Defendant also points out that the victim did not report the incidents to the jail guards, who apparently learned of the incidents from another inmate.
The standard for determining sufficiency of evidence was recently stated in State v. Graham, 420 So.2d 1126 (La.1982) as follows:
"The present standard by which the sufficiency of the state's evidence is determined was set forth by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing den. 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). We have also adopted this standard as expressed in State v. Straughter, 406 So.2d 221 (La.1981); State v. Campuzano, 404 So.2d 1217 (La.1981) and State ex rel Ross v. Blackburn, 403 So.2d 719 (La. 1981).
"In reviewing a case to determine whether the evidence supports a conviction, the standard set forth, in Jackson, supra, requires this court to examine the record to determine if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact *887 could have found the essential elements of the crime beyond a reasonable doubt. State v. Hicks, 395 So.2d 790, 797 (La. 1981)."
Viewed in the light most favorable to the prosecution the testimony of the victim, corroborated to some extent by the testimony of other inmates, establishes the following facts. Defendant and Townsend, who did not previously know each other, had been incarcerated together in cell block D for several weeks. Eleven or twelve inmates of the cell block slept on five double bunks and one or two mattresses on the floor. On the Friday afternoon of the first incident Townsend got into a fight with another inmate, Caleb McDonald, who along with Billy Boyte was a friend of the defendant. The defendant broke up the fight and after the fight told Townsend that "he was going to teach me the ropes" and "more or less protect me ... in return for sexual favors." Townsend told the defendant he "didn't do that kind of stuff." After midnight when all of the other inmates were apparently asleep defendant approached Townsend at his bunk and said he wanted Townsend to come down to a mattress on the floor. The defendant had made arrangements to switch bunks with an inmate whose mattress lay out of range of the television camera covering the cell. Townsend said he "didn't want to do it" and defendant said that if Townsend didn't "he was going to cut me loose ... he was going to take it if I didn't." Townsend was afraid of the defendant because of things the defendant had said and fights he had gotten into. On one occasion defendant had knocked another inmate's tooth out and on another occasion he had commandeered a mattress from another inmate. Defendant, McDonald, and Boyte "stuck together" and were "tight" and if a fight broke out "all three would be in on it." Townsend was scared to try to push the call button and believed that he would "get my ass whipped or jumped on" if he did so. It sometimes took the guards 30 minutes to answer the buzzer and he thought there was "no sense" in trying it. Although Townsend protested, he got down on his stomach on the mattress and the defendant performed anal intercourse. Townsend testified "it hurt bad", that he "started crying" and that he was "scared of getting the hell beat out of me."
The following Sunday, again late at night after the inmates were apparently asleep and after making arrangements to switch mattresses, defendant again approached Townsend. Townsend again said he "didn't want to do it" and that he was hurt. Defendant told him he was going to "cut me loose for the cell and they was waiting." Townsend understood him to mean that all of the cell "was going to try it and was going to do it"; that "they were either going to whip my ass or they were going to do the same thing he done." Townsend believed he would get no help from anyone in the cell and that he could do nothing to prevent it. The defendant again attempted to perform anal intercourse but was unable to do so.
After the incidents the victim made some effort to get attention from a nurse on a complaint of a kidney disorder but was unable to do so. Another inmate apparently told the officers about the incidents and Townsend was removed from the cell and taken to the hospital.
Another inmate testified that he observed the fight in which Townsend and defendant and his two friends were involved, and also observed the "sexual activity" the first night. The inmate testified that he did not do anything to call for help because he was afraid that he might get beat up and was afraid for his own safety. This inmate also testified that it often took the guards a long time to respond to the buzzer and sometimes the guards turned the buzzer off.
Another inmate testified about the fight in which Caleb McDonald "jumped on" James Townsend. He also saw Townsend and the defendant move to the mattress on the floor late at night. He testified that it usually took the guards 5 or 10 minutes to respond to the buzzer.
The inmate with whom defendant switched bunks testified about the fight *888 and that he saw defendant go to Townsend's bunk late that night and wake him up. He heard defendant tell Townsend to come down there and then the defendant "sort of pushed him down and raped him." The inmate testified that Townsend "tried to yell out and was crying at the same time and just couldn't yell." He testified that he did not try to help and that he believed if he got up and pushed the button "the same thing would have happened to me."
Another inmate testified that after the incidents the defendant asked him "how he could beat this", and that when he asked the defendant what had happened the defendant said "I raped him. I raped Indian." He testified that the defendant told him he "slapped" Townsend and "threatened to beat his ass" and that Townsend then "went on ahead and did it."
There was evidence that the cell is equipped with a television monitor for security purposes, but it was also established that the monitor did not cover the entire cell and particularly the mattress upon which the acts took place. It was also shown that after the lights are turned out it is impossible to see anything on the television monitor. The call button rings throughout the jail and is loud enough for anybody to hear it. The cell is located approximately 20 feet from the booking desk where a guard is ordinarily on duty, and a guard at that location would ordinarily hear a scream from the cell. The jailer testified that if an inmate were being abused he would respond and help him because that is his job. The jailer testified that on the night of the first incident he did not hear any screams or calls for help. Another jailer testified that if the call button is activated the call would be answered if there is a need to. He testified if there was an alarm call he would not wait 30 minutes to answer it. On the nights of the incidents he did not hear any screams and the call button was not activated.
Contrary to the defendant's arguments, there was sufficient evidence for a rational juror to conclude beyond a reasonable doubt that the defendant conveyed threats of physical violence to the victim. The victim so testified and his perception of threats of physical violence is corroborated by the evidence of fights in which the defendant and his cohorts were involved and the fear of getting beat up expressed by other inmates of the cell. The use of some force and threats is further established by the defendant's admission to one of the inmates after the incidents occurred.
The victim's reasonable belief that resistance would not have prevented the rape is established by his believable testimony, considered in the light of this institutional setting. His perception that he would receive no help from other inmates in the cell is verified by the fact that the incident was observed by at least three of the other inmates and they did not come to his assistance and were themselves afraid. The television monitor offered no assistance because of its limited coverage and because the lights were out. The call button may or may not have been accessible to the victim, but the victim's reasonable perception, verified by at least one other inmate, was that use of the button would not necessarily result in a prompt response from the guards. It appears that the button was used for routine calls, such as to request use of the telephone or to contact the nurse, and not only for alarm purposes. Screams might have brought assistance depending on where the guards were at the particular moment, but Townsend's belief at the time under the particular circumstances that resistance was useless was a reasonable belief.
Viewed in the light most favorable to the prosecution, there was sufficient evidence for a rational juror to conclude that all of the essential elements of the crime were established beyond a reasonable doubt. This assignment of error is without merit.
By assignment of error No. 2 the defendant contends that the trial judge erred in sustaining the prosecution's objection to defendant's expert witness and not allowing the witness to testify as to the relationship between prison security and consensual versus nonconsensual sex. Defendant argues that it was fundamental to the defense that the jury understand the nature of sex in prison. It is argued that the witness, director *889 of the criminal justice program at Northeast Louisiana University and a penologist, would have testified that consensual sex routinely takes place in prison when an inmate who is afraid accepts the protection of another inmate and gives sexual favors in return. It is argued that adequacy of security measures was an issue in the case and that the testimony of the expert as to prison security was vital to the defense.
Competency of an expert witness is a question of fact within the sound discretion of the trial judge, and his rulings on qualifications of experts will not be disturbed unless clearly wrong. State v. Michel, 422 So.2d 1115 (La.1982); LSA-R.S. 15:466.
In State v. Stucke, 419 So.2d 939 (La. 1982) the court sustained the action of the trial court in excluding the testimony of an experimental psychologist who specializes in the psychology of witnesses concerning the quality of an eyewitness identification. The court concluded "... that the prejudicial effect of such testimony outweighs its probative value because of the substantial risk that the potential persuasive appearance of the expert witness will have a greater influence on the jury than the other evidence presented during the trial. Such testimony invades the province of the jury and usurps its function."
This conclusion is equally applicable to the instant case. A general discussion of prison security and its relationship to consensual and nonconsensual sex would not have aided the jury in its resolution of the issues involved in this particular case, where there was adequate evidence offered from which the jury could determine the facts based on the common knowledge, experience, and education of men. Assignment of error No. 2 is without merit.
In assignment of error No. 3 the defendant contends that the trial judge erred in overruling defense counsel's objections to the introduction into evidence of testimony regarding events after the fact.
After the victim began testifying to a conversation he had with the defendant immediately after the occurrence of the first incident counsel for defendant objected on the grounds that anything occurring after the act is irrelevant. The objection was properly overruled by the trial judge. The conversation which took place immediately following the act of anal intercourse while the victim was crying was part of the res gestae, and was relevant to show the commission of the offense, the defendant's intent, and to explain the facts of the incident, including the nature of the relationship between the defendant and the victim. There was no clear abuse of the trial judge's discretion in determining that this evidence was relevant. State v. Chaney, 423 So.2d 1092 (La.1982); LSA-R.S. 15:441.
Defendant also complains of testimony given by a deputy sheriff who testified that the victim had gone beserk and was in restraints in a psychiatric hospital several days after the incident. No objection to this testimony was made by counsel for the defendant. Error as to the admissibility of evidence to which no contemporaneous objection was made at trial cannot be urged on appeal. State v. Ratcliff, 416 So.2d 528 (La.1982); LSA-C.Cr.P. Art. 841.
Assignment of error No. 3 is without merit.
The convictions and sentences are affirmed.
NOTES
[1] LSA-R.S. 14:42.1.

"Forcible rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
"Whoever commits the crime of forcible rape shall be imprisoned at hard labor for not less than two nor more than forty years. At least two years of the sentence imposed shall be without benefit of probation, parole, or suspension of sentence."